**DEFENDERS OF WILDLIFE; Southwest Center For Biological Diversity, Plaintiffs–Appellants,**

v.

**Mike BERNAL; Robert Smith, Dr., Superintendent; Board, Defendants–Appellees.**

No. 98–16099.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 7, 1998

Memorandum Filed Nov. 23, 1999

Order Filed Feb. 28, 2000

Eric Glitzenstein, Meyer & Glitzenstein, Washington, D.C. and John Fritschie, Defenders of Wildlife, Washington, D.C., for the plaintiffs-appellants.

Denise M. Bainton, Lisa Anne Smith, DeConcini McDonald Yetwin & Lacy, Tucson, Arizona, Todd A. Jaeger, Legal Counsel for Amphitheater Unified School District, Tuczon, Arizona, for the defendants-appellees.

James Dougherty, Washington, DC, and Alex Levinson, San Francisco, CA, for amicus National Wildlife, et al.

Diana Boros, pro se, Tucson, AZ, for amicus Ad-Hoc Land Search Committee.

David T. Hardy, Tucson, AZ, for amicus Washington Legal Foundation.

Before: HUG, Chief Judge, FLETCHER, and TROTT, Circuit Judges.

Opinion by Chief Judge HUG; Concurrence by Judge B. FLETCHER.

## ORDER

HUG, Chief Judge:

The Memorandum disposition filed November 23, 1999, is redesignated as an authored Opinion by Chief Judge Hug with a concurrence by Judge B. Fletcher.

## OPINION

Defenders of Wildlife and the Southwest Center for Biological Diversity (collectively "Defenders") appeal the district court's order lifting a temporary restraining order and denying their motion for a permanent injunction to halt the construction of a new school on property which Defenders contend contains potential habitat for the cactus ferruginous pygmy owl (pygmy-owl), listed as endangered under the Endangered Species Act (ESA), 16 U.S.C. §§ 1531–1543. At issue in this case is whether the construction of a critically-needed new high school by the Amphitheater School District (the School District) in northwest Tucson will result in the "take" of the endangered pygmy-owl in violation of section 9 of the ESA, 16 U.S.C. § 1538(a)(1)(B).

After a three-day bench trial the district court found that the proposed construction would not result in the take of a pygmy-owl and denied the permanent injunction. In this appeal Defenders assert that the district court (1) erroneously concluded that plaintiffs failed to meet their burden of proof, (2) should have required the School District to apply for an incidental take permit, (3) inappropriately excluded expert testimony and (4) incorrectly denied Defender's Motion for a New Trial. We have jurisdiction over final judgments of the district court pursuant to 28 U.S.C. § 1291, and we affirm.

## I.

### *Factual and Procedural Background*

In 1994, the School District paid $1.78 million to purchase a 73 acre site in northwest Tucson, upon which a new high school would be built. The high school complex is intended to accommodate 2,100 students and is composed of several buildings, athletic fields and parking areas for students, faculty and visitors. In December 1994, after the purchase of the school site, the United States Fish and Wildlife Service (FWS) formally published a proposed rule to list the pygmy-owl as an endangered species under the ESA. On March 10, 1997, after the required procedures and commentary period, the FWS listed the pygmy-owl as an endangered species under the ESA.

The pygmy-owl is a small reddish brown owl known for its relatively long tail and monotonous call which is heard primarily at dawn and dusk. The pygmy-owl nests in a cavity of a large tree or large columnar cactus. Its diverse diet includes birds, lizards, insects, and small mammals and frogs. The pygmy-owl occurs from lowland central Arizona south through portions of western Mexico and from southern Texas south through other portions of Mexico on down through portions of Central America.[1] The FWS indicates that there are a total 54,400 acres of suitable pygmy-owl habitat in northwest Tucson, which includes the 73 acre school site. The school site falls within the area designated by the FWS as critical habitat for the pygmy owl. *See* 64 Fed. Red. 37,419 (1999).[2]

Within the 73 acre parcel acquired by the School District in 1994, there are three "arroyos", defined as "dry washes" or "ephemeral desert waterways". The U.S. Army Corps of Engineers designated the arroyos as "jurisdictional waters" pursuant to the Clean Water Act, 33 U.S.C. § 1251 *et seq.* The original design of the School District complex called for some construction within the "jurisdictional waters", thereby requiring the School District to

---

**1.** The cactus ferruginous pygmy-owl is one of four subspecies of the ferruginous pygmy-owl. It is the cactus ferruginous pygmy-owl that we are concerned with in this case, and the term "pygmy-owl" as used in this opinion refers to that subspecies.

**2.** Critical habitat is defined as "(i) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with [the Act], on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and (ii) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions [the Act], upon a determination by the Secretary that such areas are essential for the conservation of the species." 16 U.S.C. § 1532(5)(A).

At the time the FWS issued its regulation determining that the pygmy owl is an endangered species on March 10, 1997, it did not designate the critical habitat for the species as provided for in 16 U.S.C. § 1533(a)(3)(A). During the pendency of this appeal, in response to a lawsuit instituted in October 1997, the FWS issued a regulation on July 12, 1999, 64 Fed.Reg. 37419–37440, that designated the critical habitat of the pygmy-owl. We requested supplemental briefs from the parties discussing what effect, if any, this identification of critical habitat by the FWS had on this case. The regulation designated 731,712 acres, including the 54,000 acres north of Tucson and the 90–acre school site that had been discussed in the trial. It does not affect the result in this case brought under Section 9 of the ESA involving private land because the district court found that there was no "taking" of the endangered species (the pygmy owl). There is legal significance under section 7 of the ESA, which pertains to federal agency actions and federally authorized or funded projects. The regulation itself makes this clear:

> The designation of critical habitat has no effect on non-Federal actions taken on private land even if the private land is within the mapped boundary of designated critical habitat. Critical habitat has possible effects on activities by private landowners only if the activity involves Federal funding, a Federal permit, or other Federal action.

64 Fed.Reg. 37428 (1999).

> Critical habitat designation is only applicable to Federal lands and to private lands if a Federal nexus exists.

64 Fed.Reg. 37444 (1999).

obtain a permit under the Clean Water Act. Because a federal permit was at issue, the FWS informed the Corps that "formal consultation" pursuant to section 7 of the ESA was required to assess the impact of the proposed project on the pygmy-owl.[3] Consultation was initiated, but before completion of the process the School District withdrew its application for the permit because it had redesigned the project so that construction would not affect the jurisdictional waterways. As a result of the redesigned project, no development is planned for the 30 acres containing the arroyos in the western portion of the property. The School District has acquired or will acquire 17 acres to the east of the initially acquired property for utilization in the redesigned school project. Thus, the entire school site is 90 acres, including the 30 acres containing the arroyos. The 30 acre parcel will remain undeveloped and fenced off. For ease in identification in this opinion, the entire 90 acre parcel will be referred to as the "school site." The 60 acres upon which the school complex is designed to be built will be referred to as the "60 acre parcel". The undeveloped 30 acre parcel, which contains the arroyos, will be referred to as the "30 acre parcel".

In March 1998, the School District began plant salvaging operations as a precursor to beginning construction. Defenders immediately filed suit seeking a temporary restraining order and a preliminary injunction against the School District to prevent any action on the school site. Defenders alleged that the proposed construction violated Section 9 of the ESA because it was likely to harm or harass a pygmy-owl, which Defenders assert inhabit or use the site. Section 9 of the ESA applies to private parties, whereas Section 7 of the ESA, which had earlier been resolved, applies only to actions carried out, funded, or

authorized by a federal agency. The district court entered a temporary restraining order. The court later consolidated the hearing on Defenders' request for a preliminary injunction with the trial on the merits. Following a three-day trial, the district court issued its final order, denying the request for a permanent injunction, and lifting the temporary restraining order. We granted Defenders' motion for an injunction pending appeal.

## II.

### *Statutory Framework*

Section 9 of the ESA makes it unlawful to "take" a species listed as endangered or threatened. *See* 16 U.S.C. § 1538(a)(1)(B). "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The take alleged is that the proposed construction will harass or harm the pygmy-owl. The Department of the Interior has promulgated a regulation further defining harm and harass as follows:

*Harm* in the definition of "take" in the Act means an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.

*Harass* in the definition of "take" in the Act means an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding or sheltering. . . .

50 C.F.R. § 17.3.

Harming a species may be indirect, in that the harm may be caused by habitat

---

**3.** The pertinent part Section 7 provides:
Each federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence

of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical. . . .
16 U.S.C. § 1536(a)(2).

modification, but habitat modification does not constitute harm unless it "actually kills or injures wildlife." The Department of Interior's definition of harm was upheld against a facial challenge to its validity in the case of *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995). In upholding the definition of "harm" as encompassing habitat modification, the Supreme Court emphasized that "every term in the regulation's definition of 'harm' is subservient to the phrase 'an act which actually kills or injures wildlife.' " *Id.* at 700 n. 13, 115 S.Ct. 2407.

Three months prior to the *Sweet Home* decision we held in *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 783 (9th Cir.1995), that habitat modification that is reasonably certain to injure an endangered species by impairing their essential behavioral patterns satisfied the actual injury requirement and was sufficient to justify a permanent injunction. In a subsequent action, it was contended that *Sweet Home* had overruled *Rosboro* and that an actual violation of the ESA was required before an injunction could issue. However, in *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1066 (9th Cir.1996), we held that the Supreme Court's decision in *Sweet Home* does not overrule *Rosboro* and that a reasonably certain threat of imminent harm to a protected species is sufficient for issuance of an injunction under section 9 of the ESA.

## III.

### *Harm and Harassment Claims*

In order to prevail in this action Defenders had to prove that the School District's actions would result in an unlawful "take" of a pygmy-owl. An injunction would be appropriate relief. *See Marbled Murrelet*, 83 F.3d at 1064. Defenders had the burden of proving by a preponderance of the evidence that the proposed construction

would harm a pygmy-owl by killing or injuring it, or would more likely than not harass a pygmy-owl by annoying it to such an extent as to disrupt its normal behavioral patterns. *See Rosboro*, 50 F.3d at 784. The district court's final order was a thorough, detailed and carefully reasoned discussion and analysis of the testimony of the expert witnesses and other evidence produced at the trial. The judge framed his discussion and analysis as follows:

> In this case, there are primarily two material factual questions: 1) Does a pygmy-owl use or occupy any part of the school site? 2) Will the construction and operation of the site result in a § 9 "take" through the "harm" or "harassment" of a pygmy-owl? The Court has concluded that the evidence supports a finding that an owl or owls use a portion of the site which the Defendants do not intend to develop. Accordingly, the Court's inquiry has further devolved into two remaining questions: 1) whether clearing the unused portion of the property could "take" the owl, in spite of what the FWS has concluded in the Final Rule,[4] and 2) what proof is offered that the construction and operation of the school will harm or harass the owl.

The district judge first discussed his factual findings as to the territory that was occupied or used by the pygmy-owls. He found from the expert testimony and other evidence produced that the pygmy-owls used territory to the north of the boundary and the west of the boundary of the school site and that no pygmy-owl had been detected anywhere within the school site itself. However, he found that there was a reasonable inference that one or more pygmy-owls used the area of the arroyos between the north boundary and west boundary of the school site. These arroyos are within the 30 acre parcel that will remain undeveloped. He also found that there

---

4. The FWS said in its Final Rule that the clearing of unoccupied habitat would not be a § 9 take, whereas the "clearing or significant modification of occupied habitat" could potentially harm, harass, or otherwise take the pygmy owl. 62 Fed.Reg. 10746 (1997).

was insufficient evidence to prove that a pygmy-owl used any portion of the 60 acre parcel upon which the school complex is to be built.

The judge explained at some length what evidence he relied on to support his findings. The judge stated that the opinion of scientific experts, the evidence of the habits of the pygmy-owl, and the recent aural detection of the bird, supports a logical inference that the bird or birds currently use the areas where they have been detected near the north and west boundaries of the site, and the area between those two points within the arroyo. He noted that because habitat within this arroyo area is suitable for pygmy-owls, provides cover and prey for birds, provides a natural corridor for the owl to travel from the north boundary to the west boundary where it has been frequently sited, an inference can be drawn that the owl uses this area. The judge then contrasted the 30 acre parcel, which he refers to as "the Area", with the rest of the school site:

> Contrarily, there have been no sightings of the owl beyond the clusters of detections near the north and west boundaries of the property and extensive surveys of the entire property have failed to produce one single detection of a pygmy-owl. A search of 361 cavities of saguaro cacti on the site, in which pygmy owls prefer to nest, produced no pygmy-owls. There is therefore little factual basis to conclude that the owl uses the rest of the school site, outside of the Area.... Because owls display site fidelity and have been seen near the Area but never detected on the school site outside of the Area, in spite of concentrated efforts to find them there, a logical inference can be made that the owl is not using the remainder of the site.... Finally, the heaviest concentrations of sitings confirmed by the [Arizona Game and Fish Department] near the site are in residential areas west of the school site where there is low impact housing (one house on a 3–5 acre plot

with minimal disturbance to native vegetation).... This supports the inference that the "core" of the owl's activity may not be in the Area but may be west of the school site, and that the 30 acre Area may be the outer fringe of the territory the bird uses.

The district court next discussed the basis for his finding that harm to the pygmy owl was not proven. He observed that while the inference that an owl uses the 30 acre parcel is based on solid factual premises and well-founded expert opinion, the allegation that the construction of the high school will harm the owl lacks this support and is weakened by seemingly inconsistent facts. The judge noted that although he gives weight to the opinions of the experts, he cannot blindly rely on their opinions and must consider how the conclusions were reached and whether they are relevant and reliable, citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). One of Defenders' experts had testified that a school would increase the amount of human activity on the school site and that although pygmy-owls can tolerate some level of human activity, he suspected that level would be enough to render or cause a pygmy-owl not to occupy the area. The judge noted that in contradiction to the expert's suspicions that the owl would be harmed by human activity associated with the high school, there was evidence that pygmy-owls can tolerate a fairly high degree of human presence. The Arizona Game and Fish Department had reported that "pygmy-owls are not intimidated by the presence of people or can acclimate to low density urbanization and associated activities." In 1995–96, a K–8 school was constructed and has been operating a short distance north of the proposed school site. One neighbor testified that she had chased an owl shouting at it and waving a broom, but the owl had returned to the residence. At one residence, an owl family was found in a grapefruit tree close to the house and was inspected at close range for weeks on end by the resident and his guests.

The judge stated that the facts do not support a finding that the owl will be harassed. He noted that there was evidence that the owl can tolerate and even benefit from human activity, and that Defenders have only offered speculation that the activity associated with the school would harass the owl. He observed that the experts made little or no attempt to support their opinions with recorded observations of pygmy owls in similar circumstances or to draw analogies from other similar birds. The judge found that this failure to support opinion with fact seriously degraded the value of the expert opinions. He stated "the limited data about the owls which was presented did not show with clarity that breeding, feeding, and sheltering would be adversely impacted by the construction or operation of the school." The judge summarized his findings as follows:

> The contradictory facts presented by Plaintiffs and assumptions about what will harm the bird cannot support a conclusion that the owl will actually be injured or will likely be harassed. Finally, the FWS has concluded that clearing of unoccupied habitat will not "take" an owl and the Court has concluded that construction of the school, as planned, will not involve clearing of occupied habitat.

■ We review a district court's finding of fact under the clearly erroneous standard. *See* Fed.R.Civ.P. 52(a); *Russian River Watershed Protection Comm. v. Santa Rosa*, 142 F.3d 1136, 1140 (9th Cir. 1998). The well supported factual findings of the district judge are not clearly erroneous, and we affirm the conclusion of the district court that the construction of the school complex will not "take" a pygmy-owl.

### IV.

#### Failure to Apply for an Incidental Take Permit

Defenders contend that the district court should have required the School District to apply for an Incidental Take Permit (ITP). The district court concluded that the permitting provisions found in Section 10 of the ESA are not mandatory. We review a district court's conclusion on a question of law de novo. *See Russian River*, 142 F.3d at 1141.

If a proposed action constitutes a take under Section 9 of the ESA, a party may apply for an ITP under Section 10. 16 U.S.C. § 1539(a)(1)(B). If the FWS grants the ITP, the party can proceed with the proposed activity despite the taking of an endangered species. The School District declined to apply for an ITP because its position was that the proposed construction would not result in the take of an endangered pygmy-owl. Defenders argue that the district court erred by failing to require the School District to seek an ITP based on the expert scientific testimony presented.

We have established that pursuing an ITP is not mandatory and a party can choose whether to proceed with the permitting process. *See Rosboro*, 50 F.3d at 783. However, if a party chooses not to secure a permit and the proposed activity, in fact, takes a listed species, the ESA authorizes civil and criminal penalties. *See* 16 U.S.C. § 1540. Thus a party may proceed without a permit, but it risks civil and criminal penalties if a "take" occurs. The district court did not err in concluding that the School District was not required to seek an ITP.

### V.

#### Evidentiary Rulings

■ Defenders assert that the district court committed clear error by excluding additional critical testimony and evidence from Dr. Anthony Povilitis, a conservation biologist, and Mary Richardson, an expert on pygmy-owls. Evidentiary rulings are reviewed for an abuse of discretion and

should not be reversed absent some prejudice. *See Equal Employment Opportunity Comm'n v. Pape Lift, Inc.*, 115 F.3d 676, 680 (9th Cir.1997).

### A. Dr. Anthony Povilitis

Dr. Povilitis holds a Ph.D in wildlife biology and is an established conservation biologist. In granting the motion in limine, the district court explained that "in [Dr. Povilitis'] deposition it appeared that he was qualified to issue an opinion as to the viability of the pygmy-owl population ... but he stated quite frankly in his deposition that he was unable to do that. Beyond that, I don't think that the other matters he would offer would be of any relevance in this case."

■ Much of what Dr. Povilitis would have testified to was background information on conservation biology and pygmy-owls in general, not specific information about pygmy-owls on the site or in the area. Defenders failed to show that the exclusion of Povilitis' testimony had any prejudicial effect. Most of Dr. Povilitis proposed testimony was addressed by other testifying experts. Therefore, we conclude that the district court did not abuse its discretion in excluding Dr. Povilitis' testimony.

### B. Mary Richardson

Mary Richardson is a pygmy-owl expert with the FWS and was the primary author of the FWS rule listing the pygmy-owl as an endangered species. In addition, she visited the project site in connection with the Section 7 consultation triggered by the request for a permit under the Clean Water Act. Based upon a 1997 letter from FWS to the Army Corps of Engineers, Defenders contend that Richardson could have testified to whether noisy construction and a student parking lot would be likely to harass or harm pygmy-owls and whether it is likely that pygmy-owls are using only the 30 acre northwest portion of the parcel. The School District filed a motion to quash Richardson's deposition.

In support of that motion, Nancy Kaufman, Richardson's supervisor at the FWS, submitted an affidavit providing that she has a policy against FWS biologists testifying at trial between private litigants. First, Kaufman noted that the FWS office in Arizona has the largest workload in the nation and the biologists simply do not have time to testify. Second, the policy ensures that staff biologists are able to give their best scientific opinion on an issue without concern that they may have to testify in litigation.

■ In granting the motion to quash, the district court concluded that the utility of Richardson's testimony would be outweighed by the government's interests in avoiding an undue burden on its personnel. Based on the affidavit provided by Nancy Kaufman and the reasons supporting the FWS' policy of not allowing their biologists to testify in trials between private litigants, we find that the district court did not abuse its discretion in excluding Richardson's testimony.

### VI.

### *Motion for a New Trial*

The bench trial for this case commenced on April 29, 1998 and ended on May 1, 1998. On May 8, the district court issued its order denying Defenders' claims under the ESA. Defenders then filed a Motion for a Partial New Trial pursuant to Fed. R.Civ.P. 59(a), asserting that (1) the surveys of the site for pygmy-owls conducted by Mary Darling just three days before trial were unscientific based upon an affidavit from her co-worker, Michael Terrio, (2) new physical evidence was discovered on the site that could indicate pygmy-owl presence, and (3) the district court should have granted a continuance to allow Defenders to survey the site for indications of pygmy-owls. The district court denied the 59(a) Motion.

■ Under Fed.R.Civ.P. 59(a), the district court has the discretion to reopen a judgment if one has been entered, take

additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions. A district court's decision granting or denying a motion under Rule 59(a) is reviewed for an abuse of discretion. *See Browning–Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.,* 492 U.S. 257, 278, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989); *Scott v. Ross,* 140 F.3d 1275, 1281 (9th Cir.1998). In order to establish that the district court abused its discretion in denying a motion for a new trial on the basis of newly discovered evidence, Defenders must establish that (1) the evidence was discovered after trial, (2) the exercise of due diligence would not have resulted in the evidence being discovered at an earlier stage and (3) the newly discovered evidence is of such magnitude that production of it earlier would likely have changed the outcome of the case. *See Coastal Transfer Co. v. Toyota Motor Sales, U.S.A.,* 833 F.2d 208, 211 (9th Cir. 1987).

Mary Darling, a consultant hired by the School District, testified that based upon her survey of the site, conducted on April 26, 1998, three days before trial, there were no pygmy-owls occupying the property owned by the School District. Based on these searches, Darling testified that she did, in fact, see one small owl with eggs in a saguaro cavity on the property, but that she concluded it was an elf owl rather than a pygmy-owl. Subsequent to the trial, Darling returned to the site, on May 30 and June 1, to verify that she had in fact seen an elf owl rather than a pygmy-owl because distinguishing between the two is often difficult. She verified that she did see an elf owl.

■ In support of their 59(a) motion, Defenders provided an affidavit from Michael Terrio, Darling's coworker who was present during all three surveys, which stated that the saguaro cavity search conducted just prior to trial was "not scientifically valid" and had been "conducted in an unscientific manner." Defenders have failed to show why Terrio's testimony could not have been obtained, with the exercise of due diligence, at the time of trial. His affidavit, moreover, cannot be used post-trial in an attempt to impeach Darling's trial testimony that no pygmy-owls were using the site.

Terrio's affidavit further stated that upon returning to the site on May 30 and June 1 to verify Darling's identification of an elf owl, he and Darling discovered physical evidence, such as owl pellets, dried lizard remains, lice, and nesting material in one of the saguaros, which could indicate that a pygmy-owl had previously nested in a saguaro cactus toward the center of the property. Because these searches occurred on May 30 and June 1, after the trial, the information contained in Terrio's affidavit constitutes newly discovered physical evidence regarding the School District's property. However, there is no showing why this evidence, with the exercise of due diligence, could not have been discovered prior to trial. During discovery, Defenders could have requested access to the site in order to survey the cactus cavities and check for physical evidence of pygmy-owls. Defenders cannot now use a Rule 59(a) Motion to extend the discovery deadline. In addition, physical evidence that *could* indicate the presence of a pygmy-owl on the site is not of the magnitude that would likely change the outcome of this case, especially since this physical evidence could also indicate the presence of an elf owl.

■ Finally, Defenders assert that it was highly prejudicial for the district court to rely on Darling's testimony without allowing plaintiffs a continuance to independently survey the potential nesting cavities on the site, especially in light of the affidavit from her co-worker. At the time of trial, Defenders requested that the court grant a continuance to allow them a few extra days to conduct an independent investigation of the saguaro cavities on the site since Darling had conducted her survey just prior to trial. The district court denied the request. As discussed above, Defenders could have completed such a survey during discovery before trial.

Therefore, the district court did not abuse its discretion by denying the request for a continuance.

We agree with the district court that the evidence submitted in support of the Motion for a Partial New Trial is insufficient to grant a new trial. Accordingly, we conclude that the district court did not abuse its discretion in denying Defenders' Motion for a New Trial.

## VII.

### Fed.R.Civ.P. 60(b) Motion

■ While this appeal was pending Defenders filed a motion under Federal Rule of Civil Procedure 60(b) asserting that newly discovered evidence concerning the area used or occupied by the pygmy-owl should be considered by the district court. We waited to hear if the district court wished to entertain the motion. *See Gould v. Mutual Life Ins. Co. of New York*, 790 F.2d 769, 772 (9th Cir.1986) (explaining the procedures to be followed when bringing a Rule 60(b) motion after a notice of appeal has been filed); 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2873 (1995) (same). On September 23, 1998, the district court issued an order declining to entertain or grant the Rule 60(b) Motion. A district court order declining to entertain or grant a Rule 60(b) Motion is a procedural ruling and not a final determination on the merits. *See Gould*, 790 F.2d at 772 (citing *Crateo v. Intermark, Inc.*, 536 F.2d 862, 869 (9th Cir.1976)). Because there is no final judgment on the merits, the underlying issues raised by the 60(b) Motion are not reviewable on appeal. *Canadian Ingersoll–Rand Co. v. Peterson Products of San Mateo, Inc.*, 350 F.2d 18, 27 (9th Cir.1965).

### Conclusion

Based on the foregoing, the judgment of the district court is AFFIRMED.

FLETCHER, Circuit Judge, concurring:

I concur in the opinion but make these observations to clarify the limited prece-

dential value of our opinion-the principal reason for our declining to publish in the first instance. Future cases that involve action or contemplated action in pygmy owl habitat in Arizona will be informed by the critical habitat designation and accompanying explanation in the new Final Rule. At the time this case was tried and argued to us on appeal no final designation on critical habitat had been made. We concluded that the critical habitat designation had no legal significance in this action brought under Section 9 which involves private land. We concluded that the critical habitat designation did not alter the outcome in this case because, in the end, this case turned on the sufficiency of plaintiffs' evidence, not on the inclusion or exclusion of the school site from critical habitat. As explained in the FWS regulation, "[c]ritical habitat has possible effects on activities by private landowners only if the activity involves Federal funding, a Federal permit, or other Federal action." 64 Fed.Reg. 37428 (1999). Here, the district court made a factual determination that, based on plaintiffs' evidence, the pygmy owl did not occupy the school construction site. We concluded that that factual decision was not clearly erroneous. In light of the earlier FWS rule stating that the clearing of unoccupied habitat does not result in a "take," the district court concluded that plaintiffs' offered insufficient evidence to demonstrate a take. *See* Opinion at 927. We do not hold that the designation of critical habitat will never have any bearing on actions on private lands within designated critical habitat, and thus, our decision has limited value for any other case involving either the pygmy owl or private lands that lie within the mapped boundary of designated critical habitat. *See Palila v. Hawaii Dep't of Land & Natural Resources*, 639 F.2d 495 (9th Cir. 1981).