NATIONAL ASSOCIATION OF HOME BUILDERS, et al., Plaintiffs,

v.

Gale A. NORTON, Secretary, U.S. Department of the Interior, et al., Defendants.

No. CIV.A.00–2155(JDB).

United States District Court, District of Columbia.

Dec. 24, 2003.

---

Robert D. Thornton, Nossaman, Guthner, Knox & Elliott, L.L.P., Irvine, CA, Counsel for plaintiffs.

Andrew J. Doyle, Department of Justice, Environment & Natural Resources Division, Washington, DC, Counsel for defendants.

## *MEMORANDUM OPINION*

BATES, District Judge.

This case involves the recurrent theme of the tension between the interests of landowners and those of an endangered species—here a small butterfly found only

in a few areas of southern California. In this thirtieth year of the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, through which wildlife and their habitat were given the means to contest property and development interests, the Court is asked to curtail the use of certain survey methodologies prescribed by the federal government to determine the presence of the butterfly. The case is brought pursuant to the ESA, the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, and the Federal Advisory Committee Act ("FACA"), 5 U.S.C.App. § 1 *et seq.* Presently before the Court are the cross-motions for summary judgment filed by plaintiffs National Association of Home Builders, California Building Industry Association, Building Industry Legal Defense Foundation, and Building Industry Association of San Diego County ("plaintiffs"), and by defendants Gale A. Norton, Secretary of the Interior, Marshall Jones, Jr., Acting Director of the U.S. Fish and Wildlife Service, the U.S. Fish and Wildlife Service, and the U.S. Department of the Interior ("defendants"). The motions raise threshold jurisdictional issues in addition to addressing the merits of plaintiffs' claims. Finding defendants' jurisdictional arguments persuasive, the Court will grant defendants' motion and deny plaintiffs' motion.

## BACKGROUND

### Statutory and Regulatory Background

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."[1] *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 180, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). In order to carry out the purpose of the ESA to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved," 16 U.S.C. § 1531(b); *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 699, 115 S.Ct. 2407, 132 L.Ed.2d 597, the Secretary of the Interior ("the Secretary"), acting through the U.S. Fish and Wildlife Service ("the Service"), lists those fish, wildlife, or plant species that he has determined to be endangered or threatened, 16 U.S.C. § 1533(a); *Rancho Viejo, LLC v. Norton,* 323 F.3d 1062, 1064 (D.C.Cir.2003). Once a species has been placed on the list of endangered or threatened species, *see* 16 U.S.C. § 1533, it becomes unlawful under § 9 of the ESA for any person to "take" the species. 16 U.S.C. § 1538(a)(1); 50 C.F.R. § 17.31(a). The term "take" is defined under the ESA as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" any listed species and includes the "attempt to engage in any such conduct." 16 U.S.C § 1532(19).

Landowners and other non-federal entities may, however, apply for and receive a permit to "take" listed species, so long as: (1) the take is incidental to any otherwise lawful activity; (2) the applicant submits an acceptable habitat conservation plan de-

---

1. Although plaintiffs set forth FACA claims in their Complaint and in their Motion for Summary Judgment, plaintiffs appear to abandon those claims by failing to address defendants' response to their claims. Defendants contend that the FACA claims must fail because they are based on the faulty premise that the Protocols constitute regulations for which notice-and-comment promulgation is required. Defendants also note that plaintiffs failed, in both their complaint and response to defendants' discovery requests, to aver any distinct injury in fact for their FACA claims. Moreover, the APA also governs the availability of review of FACA claims against an agency, *see Fertilizer Inst. v. EPA,* 938 F.Supp. 52, 54 (D.D.C.1996), and the Court concludes below that it lacks jurisdiction over plaintiffs' claims under the APA.

signed to minimize and mitigate the effects of the incidental take; and (3) the take will not appreciably reduce the species' likelihood of survival and recovery. 16 U.S.C. § 1539(a)(1)(B), (a)(2)(A)-(B). The ESA also provides for the granting of scientific or "recovery" permits. Section 10(a)(1)(A) of the ESA allows the Service to "permit, under such terms and conditions as [it] shall prescribe, . . . any act otherwise prohibited by [§ 9] for scientific purposes or to enhance the propagation or survival of the affected species." 16 U.S.C. § 1539(a)(1)(A); *see also* 50 C.F.R. 17.22(a). Both types of permits are subject to revocation if the Service finds that the permittee is not in compliance with the terms and conditions of the permit. 16 U.S.C. § 1539(a)(2)(C).

To enforce § 9's prohibition on un-permitted takings, the Secretary may assess civil penalties against alleged violators through administrative, trial-like proceedings. *See* 16 U.S.C. § 1540(a)(1)-(2). The taking prohibition may also be enforced directly in court through criminal penalties. 16 U.S.C. § 1540(b). Injunctive relief is available under the ESA; the Attorney General is empowered to bring a civil suit for injunctive relief. 16 U.S.C. § 1540(e)(6). The ESA also contains a citizen suit provision, which allows private parties to enforce the substantive provisions of the ESA against regulated parties. 16 U.S.C. § 1540(g)(1)(A); *see Bennett v. Spear*, 520 U.S. 154, 173, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997).

**Factual Background**

The following facts are uncontroverted. The quino checkerspot butterfly (Euphydryas editha quino) ("quino") is a subspecies of butterfly found only in parts of two southern California counties. All known extant populations of quino in the United States occur in southwestern Riverside and north-central San Diego counties.

Adult quino can be observed during their field (or "flight") season, which occurs from mid-February to mid-May depending on the weather. Quino was listed as an endangered species under the ESA on January 16, 1997. *See* 62 Fed.Reg. 2313.

On January 25, 1999, and again around January 26, 2000, the Service made available to the public protocols ("survey protocols" or "Protocols") for determining the presence or absence of quino in several Southern California counties. The 1999 protocol states that it is "based upon the 1998 interim guidelines, input from entomologists and biologists knowledgeable about this species, data collected during the 1998 field season, literature on Quino and other *Euphydryas editha* subspecies, and other information available to [the Service]." Pls. Mot. Summ. J., Ex. 1 at 1. The 2000 protocol states that

[i]n revising the year 2000 survey protocol and survey area map [the Service] consulted with [its] Quino Recovery Technical Team and other biologists knowledgeable about the species, reviewed field data and scientific literature on quino and other *Euphydryas editha* subspecies, and reviewed comments received during and after a November 1999 public workshop on the draft year 2000 survey protocol.

*Id.*, Ex. 2 at 2. The Service held a Quino Checkerspot Butterfly Workshop on December 3, 1998, with species experts and other scientists present. The Service developed the 1999 protocol without soliciting public comment. In revising the survey protocol for the year 2000, the Service held several meetings with the Quino Recovery Technical Team ("Recovery Team") and held a public workshop in November 1999 at which landowners were present.

The Protocols provide information to landowners on how to determine whether quino exist on their property, including

what areas of southern California might contain quino; when and how to assess land within those areas for the earmarks of suitable quino habitat; and when and how to survey that suitable habitat for the presence or absence of quino. According to defendants, knowing how to survey land as accurately as possible for quino assists landowners in assessing whether their land use activities may result in a "take," and also assists landowners in gathering information to use in preparing a habitat conservation plan should they decide to apply for incidental take permits pursuant to the ESA. Defs. Cross–Mot. Summ. J. at 1.

Whether or not the Protocols impose significant requirements and obligations on landowners is a matter of dispute between the parties and will be discussed in greater detail below. The general background of the disagreement between the parties is as follows. Defendants assert that the protocols do not impose any requirements on landowners; that a landowners decision to follow the protocols is wholly voluntary; and that there are no federal sanctions or other penalties for deciding not to complete a survey. Plaintiffs, on the other hand, insist that the Protocols impose very real, time-consuming and expensive regulatory requirements on landowners within the quino survey areas; that the Service has treated the Protocols as substantive rules and regulations; and that authorities in local jurisdictions have set the Service's approval of the surveys as a condition to securing local land use approvals. *See* Pls. Mot. Summ. J. at 12.

**Procedural History**

Plaintiffs filed the current action against defendants challenging the Service's formulation, adoption, and implementation of the 1999 and 2000 Protocols. Plaintiffs allege that the Protocols unlawfully impose on landowners the obligation of determining the presence or absence of quino on their property in order for development projects to move forward. Plaintiffs complain that the Service: (1) failed to comply with required notice-and-comment procedures of the APA; (2) regulated in excess of its authority under the ESA by illegally shifting the burden of proof as to the presence of quino away from itself and onto landowners; (3) failed to rely on the best available data when enforcing the protocols; and (4) acted outside the scope of the recovery planning exemption in the course of its consultations with the Recovery Team. The parties engaged in discovery,[2] after which plaintiffs moved for summary judgment. Defendants simultaneously opposed plaintiffs' motion and cross-moved for summary judgment, arguing that the Court lacks subject matter jurisdiction over the matter and that, in any event, plaintiffs' claims are without merit. A hearing on the motions was held on October 31, 2003.

## DISCUSSION

**Applicable Legal Standard**

### A. *Summary Judgment Under Rule 56*

Summary judgment is appropriate when the pleadings and the evidence demon-

---

**2.** This action was transferred to the undersigned judge on January 3, 2002. Prior to that time, the parties had agreed to limited discovery because they were unable to agree on a joint stipulation of facts. *See* Joint Meet and Confer Stmt. (December 15, 2000) ¶ 2; Case Status Praecipe (April 16, 2001) ¶¶ 2–6. Normally, a case such as this challenging an agency rule or determination would be reviewed based on an administrative record. According to defendants, however, the Service did not prepare and submit an administrative record in this case because they maintain that the Service has not engaged in any agency action. Defs. Cross–Mot. Summ. J. at 11 n. 6.

strate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may successfully support its motion by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting Fed.R.Civ.P. 56(c)).

In determining whether there is a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. *Id.* at 252, 106 S.Ct. 2505. By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted). Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252, 106 S.Ct. 2505.

**3.** *See* note 1 *supra.*

### B. Review Under the APA

■ Plaintiffs maintain that the 1999 and 2000 survey protocols constitute substantive rules, which they challenge under the APA. The APA requires that the Court "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The "scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Assoc. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). The Court's review of the merits of plaintiffs' case is usually confined to the administrative record. *See Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) ("[R]eview is to be based on the full administrative record that was before the Secretary at the time he made his decision."). The reviewing court may, however, as it did here,[3] permit discovery when that will provide the only possibility for effective judicial review and when there have been no contemporaneous administrative findings. *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 467–58 (D.C.Cir.1994) (citing *Community for Creative Non–Violence v. Lujan*, 908 F.2d 992, 997 (D.C.Cir.1990); *Citizens to Preserve Overton Park*, 401 U.S. at 420, 91 S.Ct. 814).

### Jurisdiction

Defendants contend that this Court lacks subject matter jurisdiction over

plaintiffs' claims for three reasons: (1) plaintiffs have no cause of action under the APA because they are not challenging "agency action" within the meaning of the APA; (2) plaintiffs are not challenging "final agency action" on the part of the Service, as required by the APA; and (3) plaintiffs' claims are not ripe for judicial review and plaintiffs lack Article III standing to bring this case. The Court will address each of defendants' arguments in turn.

## A. Agency Action

The APA provides for judicial review only of "agency action" that is "final." 5 U.S.C. §§ 702, 704. Defendants contend initially that the Court lacks jurisdiction over plaintiffs' claims because plaintiffs have failed to establish the existence of a challenged "agency action" as defined by the APA. The APA defines "agency action" to include "the whole or part of any agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Both sides in this case assert that only the definition of a "rule" could be applicable to the Protocols in question. The Court agrees. The APA defines a "rule" as

> ... the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency ....

5 U.S.C. § 551(4).

Defendants contend that the Protocols are "scientific methodology and data made available to persons subject to the ESA's prohibition on 'takings'", Defs. Reply Mem. at 5, and do not constitute "rules." In response, plaintiffs assert that the D.C. Circuit has held in *Batterton v. Marshall,* 648 F.2d 694 (D.C.Cir.1980), that "agency-

established scientific methodologies *are* substantive rules subject to compliance with the APA." Pls. Reply Mem. at 4. In *Batterton,* the court held that a scientific methodology like the Department of Labor's methodology for calculating unemployment statistics *can* be considered agency action, but *Batterton* certainly does not stand for the proposition that all scientific methodologies are necessarily agency action. The D.C. Circuit determined that the agency's selection of a statistical methodology qualified as a "rule" within the meaning of the APA, because the relevant statute rendered the determination of unemployment statistics the critical factor in an otherwise inflexible statutory formula for allocating funds. *See* 648 F.2d at 705. The selection of a statistical methodology in that context therefore could be considered an "agency statement ... designed to implement ... law." *Id.* Here, however, plaintiffs have not argued, much less shown, that the relevant statutory framework in this case likewise requires that the Service's Protocols be considered "rules" under the APA. The record before this Court does not support a conclusion that the process for awarding permits allowing landowners to "take" quino or other endangered species is an inflexible one that turns ultimately on application of the Protocols, and hence the Protocols cannot be considered a statement by the Service that implements law.

Defendants also contend that the Protocols do not even qualify as "policy statements," which, under D.C. Circuit precedent, have been held not to meet the definition of a "rule" in any event; that even under the ESA's broader definition of "agency action," the Protocols cannot be considered agency action; and that the Service only provided advice in its Protocols pursuant to its power to enforce § 9 of the ESA and did not cross

76

the line between advising and directing landowners. Plaintiffs respond that the Protocols can be distinguished from policy statements because, according to the definition given in *American Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106 (D.C.Cir.1993), policy statements "advise the public prospectively of the manner in which the agency proposes to exercise discretionary power," *id.*, 995 F.2d at 1109, while the Protocols are being challenged on the basis of effects that they have *already had* on landowners, not the prospective effects they might have. Pls. Reply at 4. Plaintiffs also argue that the Protocols are "fundamentally new regulation" and, therefore, constitute agency action according to the D.C. Circuit's reasoning in *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90 (D.C.Cir.1997).

■ Plaintiffs also note that in *Appalachian Power Co. v. Environmental Protection Agency*, 208 F.3d 1015 (D.C.Cir.2000), the D.C. Circuit held that even a document the Agency termed a "guidance document" could, nevertheless, amount to "agency action" under the APA. But the precise question in *Appalachian Power* was not whether the EPA guidance document at issue there could be considered "agency action," but rather whether it could be considered "final" agency action under the APA. This observation prompts the Court to proceed to the next step in defendants' jurisdictional attack on plaintiffs' claims: that regardless of whether the Protocols qualify as "agency action," the Court lacks jurisdiction because the Protocols cannot be considered "final" agency action. *See* 5 U.S.C. § 704. As the Supreme Court stated in *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 478, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001):

> The bite in the phrase "final action" . . . is not in the word "action," which is meant to cover comprehensively every

manner in which an agency may exercise its power. *See FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 238, n. 7, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980). It is rather in the word "final," which requires that the action under review "mark the consummation of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 177–178, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997).

Without specifically resolving the question whether the Protocols constitute "agency action," then, the Court turns to the issue that it deems determinative—whether the Protocols constitute "final agency action."

### B. Final Agency Action

■ In addition to the requirement that the action in question mark the consummation of the agency's decisionmaking process, to be considered "final" the action must also "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. at 178, 117 S.Ct. 1154; *see also Appalachian Power*, 208 F.3d at 1022. Plaintiffs argue that this Court has jurisdiction over their challenge under the APA because the Protocols satisfy both conditions set forth in *Bennett v. Spear* and therefore constitute final agency action. Defendants maintain that the Protocols do not mark the consummation of the agency's decisionmaking process and, more particularly, that the Protocols do not determine rights or obligations of landowners and legal consequences do not flow from them.

With respect to the first of the *Bennett v. Spear* conditions, the Court concludes that the Protocols do mark the consummation of the agency's decision-making process. According to the text of the 1999 Protocol, the Service adopted it after actively soliciting and reviewing input from specialists in the field of entomology and

biology, data collected during the 1998 field season, literature on the quino and other subspecies, and other available information. 1999 Protocol, Pl.Ex. 1 at 1. Likewise, the 2000 Protocol states that it was adopted after the Service consulted with the Quino Recovery Technical Team and other knowledgeable biologists, reviewed field data and scientific literature on quino and other subspecies, and reviewed comments received during and after a public workshop on the draft year 2000 protocol. 2000 Protocol, Pl.Ex. 2 at 1. After the completion of these processes, the Service posted the Protocols on its Region 1 website and published official notices of availability in the Federal Register. *See* 64 Fed.Reg. 4890 (1999); 65 Fed.Reg. 8180 (2000). Nothing indicates that the Protocols are tentative or interlocutory in nature. *See Bennett v. Spear,* 520 U.S. at 178, 117 S.Ct. 1154; *Domestic Sec., Inc. v. Securities and Exchange Comm'n,* 333 F.3d 239, 246 (D.C.Cir.2003). Although they may be revised from year to year, as evidenced by the fact that the issuance of the year 2000 Protocol followed the issuance of the 1999 Protocol, this does not negate the Court's conclusion that publication and adoption of the Protocols mark the consummation of the agency's decision-making process with respect to the 1999 and 2000 Protocols. As the D.C. Circuit stated in *U.S. Air Tour Assoc. v. Federal Aviation Admin.,* 298 F.3d 997, 1013 (D.C.Cir.2002), "if the possibility . . . of future revision in fact could make agency action non-final as a matter of law, then it would be hard to imagine when any agency rule . . . would ever be final as a matter of law."

■ Defendants argue that the Protocols fail to satisfy the first condition for finality because, according to defendants, the "true test of consummation" is that "the agency has concluded a decision-mak-ing process *that matters*"—i.e., that the Service applied quino survey methodology to a landowner in a process that has consequences under the ESA. Defendants' formulation of the "true test of consummation," however, conflates the two *Bennett v. Spear* conditions. Indeed, under defendants' formulation, most rulemaking processes might fail the finality test prior to specific application producing concrete consequences. In fact, all that the consummation condition requires is that a decision-making process was brought to completion. Whether that process "matters," however, is essentially the subject of inquiry under the second prong of the test—whether the agency's decision-making process determines rights or obligations, or whether legal consequences flow from it. Having concluded that the Protocols do mark the consummation of an agency decision-making process, the Court must address whether the decision-making process concluded by the agency in the formulation of the Protocols is one that matters.

■ According to plaintiffs, the Protocols impose "very real, time-consuming and expensive regulatory requirements" upon landowners. Pls. Reply Br. at 6. These requirements include contracting the services of a limited number of biologists permitted by the Service to conduct quino surveys during the brief quino flight season; completing the quino surveys despite overlapping and inconsistent requirements to survey their property for the presence of other endangered species; and limiting the speed at which the surveying biologists can walk and the range of motion of their arms and legs as they conduct the quino surveys. *See* 1999 Protocol, Pl. Ex. 1 at 1–3; 2000 Protocol, Pl.Ex. 2 at 2–6. Plaintiffs note that if the Service determines that a landowner has not followed the Protocol in all respects, the Service retains the right to reject a determination

of an absence of quino, which forces a landowner to obtain an incidental take permit from, and submit a habitat conservation plan to, the Service before going forward with any development plans. *See* 16 U.S.C. §§ 1539(a)(1)(B), 1539(a)(2)(A). Deviating from the Protocols may also result in civil and criminal penalties for the landowner, *see* 16 U.S.C. § 1540(a)-(b), and the inability to obtain the local land use permits necessary to make the property economically viable. *See* Mem. from the Environmental Review Manager, Planning and Development Review Department, City of San Diego, "Requirements for Quino Checkerspot Surveys" (Feb. 22, 1999), Pl.Ex. 25. Relying upon *Bennett v. Spear*, plaintiffs argue that the Protocols have "a powerful coercive effect" and "alter[ ] the legal regime." 520 U.S. at 169–70, 117 S.Ct. 1154

Defendants maintain that the Protocols do not impose regulatory requirements on landowners. There are no federal requirements for landowners to survey their properties for quino and the Service cannot bring an enforcement proceeding against or impose any sanctions on a landowner merely based on the fact that he or she elects not to survey for quino or elects not to survey for quino under a particular methodology. Defendants explain that in order to prevail in an administrative or judicial proceeding, including a proceeding to enforce civil and criminal penalties under the ESA, the Service would have to present evidence that quino have been or will be unlawfully "taken." *See Pacific Gas & Elec. Co. v. Federal Power Comm'n*, 506 F.2d 33, 38–39 (D.C.Cir. 1974); *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 925–30 (9th Cir.2000). The mere issuance of the Protocols, however, does not alter the legal regime prohibiting landowners from "taking" quino without prior authorization under the ESA. Furthermore, the mere fact that the Protocols

advise against surveying without a recovery permit cannot form the basis of an enforcement proceeding; rather, an enforcement proceeding can only be based on proof that the ESA's "taking" prohibition was violated. *See Molycorp, Inc. v. EPA*, 197 F.3d 543, 547 (D.C.Cir.1999).

With regard to plaintiffs' contention that deviation from the Protocols may result in an inability of landowners to obtain the local land use permits necessary to make their properties economically viable, the Court observes that the record in this case, including the Memorandum from the Environmental Review Manager, Planning and Development Review Department, City of San Diego, Pl.Ex. 25, upon which plaintiffs rely, does not reflect that any state and/or local requirements for landowners to follow the Protocols result from federal direction. This lack of direction of the locality by any federal entity or authority distinguishes this case from *Appalachian Power*, a case upon which plaintiffs rely heavily.

In *Appalachian Power*, the D.C. Circuit concluded that the EPA document at issue, the "Periodic Monitoring Guidance for Title V Operating Permits," constituted final agency action because it reflected "a settled agency position which has legal consequences both for state agencies administering their permit programs and for companies . . . who must obtain [ ] permits in order to continue operating." 208 F.3d at 1023. The court found that the EPA document at issue, even though it was termed "Guidance," required state agencies to review their emissions standards in light of EPA standards to determine whether they provided enough monitoring, and required states to insert additional monitoring requirements as terms and conditions of a permit if the states believed existing requirements to be inadequate according to analyses set forth in the Guid-

ance. *Id.* at 1022. As noted previously, in contrast to *Appalachian Power*, the record in this case fails to demonstrate that any reliance on the Protocols by state or local authorities in the local land use permitting process is the product of federal direction or requirement.

■ It is, however, understandable that the issuance of the Protocols may have caused anxiety on the part of landowners conscientiously seeking to avoid liability in pursuing their land development plans. Although defendants insist that the Protocols do not impose on landowners an *obligation* to survey or to do so in the manner recommended by the Protocols, defendants concede that it "certainly may be prudent for such landowners to learn whether, in fact, quino exist on their land (so that they can avoid an unlawful take, which could subject them to civil remedies and civil and criminal penalties)," Defs. Cross–Mot. Summ. J. at 29, and that, if the surveys that landowners have conducted are inaccurate, they "may stand a greater chance of later discovering, to their potentially costly surprise, that they are harming an endangered species on their property." *Id.* at 30. The fact remains, however, that the Protocols themselves do not alter the legal regime affecting landowners. The liability of landowners for unlawful "takings" of quino is ultimately derived from the ESA and its implementing regulations, and not from the Protocols. Likewise, whether the Protocols affect the ability of landowners to obtain local authorization for property development proposals is a matter decided by the local jurisdictions, not by any federal entity—any requirement involving the Protocols is thus a matter of local, not federal, direction. The Court therefore concludes that, based on the evidence in the record, plaintiffs cannot demonstrate that the Protocols determine rights or obligations of landowners or that legal consequences flow from the Protocols. Under *Bennett v. Spear*, then, the Protocols do not satisfy the second condition for agency action to be final and thus subject to judicial review under the APA.[4]

### C.  Ripeness and Standing

■ The lack of evidentiary support for plaintiffs' contention that the Protocols alter the legal regime and have a discernable coercive effect on landowners also reveals another reason why this Court lacks jurisdiction over plaintiffs' claims: the claims are not ripe. The ripeness doctrine is meant to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). The Supreme Court has articulated three factors to consider in evaluating ripeness: (1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inap-

---

4. Plaintiffs also invoke the ESA, 16 U.S.C. § 1540(g)(1)(C), as a source for subject matter jurisdiction over plaintiffs' claims. The APA makes judicial review available for two types of agency action: (1) "[a]gency action made reviewable by statute", and (2) "final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704. Although only the second category makes specific reference to finality, the D.C. Circuit has held that the finality requirements set forth in the APA apply equally to claims advanced pursuant to the first category. *Carter/Mondale Presidential Comm., Inc. v. FEC*, 711 F.2d 279, 285 n. 9 (D.C.Cir.1983). The Court therefore concludes that subject matter jurisdiction over plaintiffs' claims also does not exist directly under the ESA because there is no final agency action.

propriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented. *Ohio Forestry Ass'n v. Sierra Club,* 523 U.S. 726, 733, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998). Although the challenged Protocols were issued in 1999 and 2000 and plaintiffs filed this action in September 2000, the record contains no evidence that any member of plaintiffs' organizations has to date been subject to adverse federal agency action under the Protocols, over a period of more than four years. Delaying review until a time when plaintiffs challenge an actual instance of final agency action through the application of the Protocols against one of their members would not cause hardship to plaintiffs, but would allow for the development of facts related to the issues plaintiffs seek to present. Judicial intervention at this time absent a concrete factual setting with regard to the impact of the Protocols would be premature.

For similar reasons, plaintiffs lack standing to bring their claims under Article III of the U.S. Constitution. To establish Article III standing, "a party must show that it has suffered an injury in fact, that there exists a causal link between that injury and the conduct complained of, and that a favorable decision on the merits will likely redress the injury." *U.S. Ecology, Inc. v. United States Dept. of the Interior,* 231 F.3d 20, 24 (D.C.Cir. 2000) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). The burden of establishing the existence of standing belongs to plaintiffs as the party invoking federal jurisdiction. *See Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 103–04, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Based on the Court's conclusions regarding final agency action discussed above, the Court also concludes that plaintiffs have failed to establish standing because they have failed to show through evidence any injury in fact or a "causal link" between any injury they allege they have suffered and the complained of "conduct" on the part of the Service—i.e., the formulation, adoption, and implementation of the Protocols.

## CONCLUSION

For the foregoing reasons, the Court concludes that it lacks jurisdiction over plaintiffs' claims brought under the APA, ESA, and FACA. The Court will therefore grant defendants' motion for summary judgment and deny plaintiffs' motion. A separate order accompanies this memorandum opinion.

## ORDER

Pursuant to the hearing held in this case on October 31, 2003, and upon consideration of the parties' cross-motions for summary judgment, and the entire record herein, and for the reasons stated in the Memorandum Opinion issued on this date, it is this 24th day of December, 2003, hereby ORDERED that:

1. The motion of plaintiffs National Association of Home Builders, California Building Industry Association, Building Industry Legal Defense Foundation, and Building Industry Association of San Diego County for summary judgment is DENIED;

2. The cross-motion of defendants Gale A. Norton, Secretary of the Interior, Marshall Jones, Jr., Acting Director of the U.S. Fish and Wildlife Service, the U.S. Fish and Wildlife Service, and the U.S. Department of the Interior for summary judgment is GRANTED;

3. This action is DISMISSED in its entirety for want of a final agency action subject to judicial review at this time; and

4. This case is CLOSED.